IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JAMEE RODRIGUEZ,                        §
                                        §
                  Plaintiff,            §
                                        §
VS.                                     §     CIVIL ACTION NO. H-12-0764
                                        §
COOPER CAMERON VALVES TBV               §
TECHNO, INC.,                           §
                                        §
                  Defendant.            §

<u>OPINION AND ORDER</u>

Pending before the Court in the above referenced action alleging hostile work environment, wrongful termination as disparate treatment discrimination based on race and gender, and retaliation for engaging in a protected activity under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981,[1] is Defendant Cooper Cameron Valves TBV Techno, Inc.'s ("Cameron's") motion for summary judgment (instrument #17). Plaintiff Jamee Rodriguez ("Plaintiff" or "Rodriguez"), although represented by counsel, has failed to file a response to the motion.

**Standard of Review**

Summary judgment under Federal Rule of Civil Procedure 56(c)

---

[1] In her Original Complaint, Rodriguez asserted a claim for and intentional infliction of emotional distress under Texas common law, but she and her counsel waived/abandoned that claim at her deposition, #17-1 at 18:18-19:4. Also in her Original Complaint in the first heading under Facts she listed "disparate impact," but in the discussion she referred to being "subjected to disparate treatment." During her deposition the difference between the two was explained to her and her attorneys, and she abandoned the disparate impact claim. #17-1 at 16:9-17:22.

-1-

is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R, Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Id.* The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 712-13.

The application of the rule depends upon which party bears the burden of proof at trial. If the movant bears the ultimate burden at trial, the movant must provide evidence to support each element of its claim and demonstrate the lack of a genuine issue of material fact regarding that claim. *Rushing v. Kansas City S. Ry.*, 185 F.3d 496, 505 (5th Cir. 1999), *cert. denied*, 528 U.S. 1160 (2000).

If the movant does not bear the burden of proof at trial, as is the case here, the movant may either offer evidence that undermines one or more of the essential elements of the nonmovant's claim or point out the absence of evidence supporting essential

elements of the nonmovant's claim; the movant may, but is not required to, negate elements of the nonmovant's case to prevail on summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998); *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264 (5th Cir. 1991); *Saunders v. Michelin Tire Corp.*, 942 F.2d 299, 301 (5th Cir. 1991). Then the nonmovant must go beyond its pleadings and identify specific facts showing that there is a genuine issue of material fact for trial. *Id.* at 324. "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial" and summary judgment is mandatory. *Celotex*, 477 U.S. at 323; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075-76(5th Cir. 1994)(*en banc*).

"'[A] subjective belief of discrimination, however genuine, [may not] be the basis of judicial relief.'" *Lawrence v. Univ. of Texas Medical Branch*, 163 F.3d 309, 313 (5th Cir. 1999), *quoting Elliott v. Group Med. & Surgical Serv.*, 714 F.2d 556, 567 (5th Cir. 1983).

A motion for summary judgment cannot be granted merely because no opposition has been filed, even though a failure to respond violates a local rule. *Hibernia National Bank v. Administracion Central Sociedad Anonima*, 776 F.2d 1277, 1279 (5th Cir. 1985), *citing John v. State of La. (Bd. of Trustees for State Colleges & Universities)*, 757 F.2d 698, 709 (5th Cir. 1985). "The movant has

the burden of establishing the absence of a genuine issue of material fact and, unless he has done so, the court may not grant the motion regardless of whether any response was filed." *Id., citing id.* at 708. A decision to grant summary judgment based only on default is reversible error. *Id.* Even if a plaintiff fails to file a response to a motion to dismiss despite a local rule's mandate that a failure to respond is a representation of nonopposition, the Fifth Circuit has rejected the automatic granting of dispositive motions lacking responses without the court's considering the substance of the motion. *Watson v. United States*, 285 Fed. Appx. 140, 143 (5th Cir. 2008), *citing Johnson v. Pettiford*, 442 F.3d 917, 918 (5th Cir. 2006), and *Johnson v. Louisiana*, 757 F.2d 698, 708-09 (5th Cir. 1985). "The mere failure to respond to a motion is not sufficient to justify a dismissal with prejudice." *Id.*

### Relevant Law

Under section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a)(1), it is "an unlawful employment action for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin."

Under the statute, suit may be brought under two distinct theories of discrimination, disparate treatment and disparate

impact. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977); *Pacheco v. Mineta*, 448 F.3d 783, 787 (5ᵗʰ Cir. 2006), *cert. denied*, 549 U.S. 888 (2006).   Title VII expressly prohibits both (1) intentional discrimination based on race, color, religion, sex or national origin, known as "disparate treatment," as well as (2) an employer's facially neutral practices that are discriminatory in operation against protected groups (race, color, religion, sex or national origin) and not required by the nature of the job, known as "disparate impact".   42 U.S.C. §§ 2000e-2(a)(1) and 2000e(k)(1)(A); *Ricci v. DeStefano*, 129 S. Ct. 2658, 2672-73 (2009); *Pacheco*, 448 F.3d at 787.   The instant suit is one for disparate treatment, which requires proof of discriminatory motive. *Pacheco*, 448 F.3d at 787.

A plaintiff may establish a claim of discrimination under Title VII by presenting direct evidence or by using the indirect method of proof set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

"Direct evidence proves intentional discrimination without inference or presumption when believed by the trier of fact." *Jones v. Overnite Transportation Co.*, 212 Fed. Appx. 268, 272 (5ᵗʰ Cir. 2006), *citing Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5ᵗʰ Cir. 2002).   "In the context of Title VII, direct evidence includes any statement or written document showing a discriminatory motive on its face." *Fierros v. Texas Dept. of Health*, 274 F.3d 187, 195 (5ᵗʰ Cir. 2001), *citing Portis v. National*

*Bank of New Albany, Miss.*, 34 F.3d 325, 328 (5th Cir, 1994); *Overnite Transportation*, 212 Fed. Appx. at 272.   If a plaintiff produces direct evidence of discrimination, he may "bypass the *McDonnell Douglas* burden-shifting framework [discussed *infra*] commonly applied in discrimination cases and proceed directly to the question of liability." *Moore v. U.S. Dept. of Agric.*, 55 F.3d 991, 995 (5th Cir. 1995); *Fierros v. Texas Dept. of Health*, 274 F.3d 187, 192 (5th Cir. 2001); *Stone v. Parish of East Baton Rouge*, No. 08-31008, 2009 WL 2169122, *2 (5th Cir. July 20, 2009).   "In such 'direct evidence' cases, 'the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor.'"   *Fierros*, 274 F.3d at 192, *quoting Brown v. East Miss. Elec. Power Assoc.*, 989 F.2d 858, 861 (5th Cir. 1993).

Under the *McDonnell Douglas* framework applied to circumstantial evidence cases, a plaintiff must first make a *prima facie* case of employment discrimination.   To establish a *prima facie* case of intentional discrimination under a disparate treatment theory Plaintiff must demonstrate that she "(1) is a member of a protected class [here that she is black and female]; (2) was qualified for the position; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class, or in the case of disparate treatment, shows that other similarly situated employees [not in the protected class] were treated more favorably." *Bryan v. McKinsey & Co.*, 375 F.3d

358, 360 (5th Cir. 2004).

An "adverse employment action for Title VII discrimination claims based on race, color, religion, sex, or national origin "'include[s] only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating.'" *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007), *quoting Green v. Administrator of Tulane Educ. Fund*, 284 F.3d 641, 657 (5th Cir. 2002). "Title VII was only designed to address '*ultimate* employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions.'" *Burger v. Central Apartment Mgmt., Inc.*, 168 F.3d 875, 878 (5th Cir. 1999)(emphasis in original), *quoting Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir.), *cert. denied*, 522 U.S. 932 (1997).  To be actionable, an adverse employment decision must be a "tangible employment action that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764 (1998).

A transfer may or may not be the equivalent of a demotion and thus qualify as an adverse employment action. *Alvarado v. Texas Rangers*, 492 F.3d 605, 613-15 (5th Cir. 2007).  Even if a transfer does not "'result in a decrease in pay, title, or grade, it can be a demotion if the new position proves objectively worse--such as

being less prestigious or less interesting or providing less room for advancement.'"  *Id.* at 613, *quoting Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999), *citing Forsyth v. City of Dallas*, 91 F.3d 769, 774 (5th Cir, 1996); *Click v. Copeland*, 970 F.2d 106, 109 (5th Cir. 1992); *Serna v. City of San Antonio*, 244 F.2d 479, 483 (5th Cir. 2001); and *Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000)("In a Title VII case, a transfer to a different position can be 'adverse' if it involves reduction in pay, prestige or responsibility."). "Whether the new position is worse is an objective inquiry." *Alvarado*, 492 F.3d at 613-14, *citing Pegram v. Honeywell, Inc.*, 361 F.3d 272, 283 (5th Cir. 2004), "'[A] plaintiff's subjective perception that a demotion has occurred is not enough.'"  *Id.* at 614, *quoting Forsyth*, 91 F.3d at 774, and also *citing Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 771 n.8 (5th Cir. 2001)("[T]he focus is on the objective qualities of the positions, rather than an employee's subjective preference for one position over another.  That subjective preference, alone, is an insufficient basis for finding an adverse employment action."); *Serna*, 244 F.3d at 483 ("[I]t is insufficient for a plaintiff to show merely that he has been transferred from a job he likes to one he considers less desirable.  Rather, a plaintiff must produce enough evidence to allow a reasonable trier of fact to conclude that, when viewed objectively, the transfer caused [him] harm . . . .").

For the fourth prong, "similarly situated" employees are

employees who are treated more favorably in "nearly identical" circumstances; the Fifth Circuit defines "similarly situated" narrowly. *Silva v. Chertoff*, 512 F. Supp. 2d 792, 803 n.33 (W.D. Tex. 2007). Similarly situated individuals must be "nearly identical" and must fall outside the plaintiff's protective class. *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005). Where different decision makers or supervisors are involved, their decisions are rarely "similarly situated" in relevant ways for establishing a *prima facie* case. *Thompson v. Exxon Mobil Corp.*, 344 F. Supp. 2d 971 (E.D. Tex. 2004), *citing Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000) for the proposition that "[a] demonstration of substantial similarity generally requires a showing that a common supervisor was involved in the decision making"). *See also Perez v. Texas Dep't of Criminal Justice, Inst'l Div.*, 395 F.3d 206, 213 (5th Cir. 2004)("We . . . have explained consistently that for employees to be similarly situated those employees' circumstances, including their misconduct, must have been 'nearly identical.'"); *Hockman v. Westward Communications, LLC*, 282 F. Supp. 2d 512, 527-28 (E.D. Tex. 2003)("The 'nearly identical' standard, when applied at the *McDonnell Douglas* pretext stage, is a stringent standard--employees with different responsibilities, different supervisors, different capabilities, different work rule violations or different disciplinary records are not considered to be 'nearly identical.'"), *citing Okoye v. Univ. of Tex. Houston Health Science*

*Center*, 245 F.3d 507, 514 (5th Cir. 2001)(Employees are not in nearly identical circumstances when their actions were reviewed by different supervisors; "to establish disparate treatment a plaintiff must show that the employer 'gave preferential treatment to [] [another] employee under 'nearly identical' circumstances' . . .; that is "the misconduct for which [plaintiff] was discharged was nearly identical to that engaged in by . . . [other] employee[s].'"")).

If the plaintiff makes a *prima facie* case, there is a presumption of discrimination, and the burden of production then shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action. *Chevron Phillips*, 570 F.3d at 615.

If the employer meets this burden, the presumption of discrimination disappears and the plaintiff bears the ultimate burden of persuading the trier of fact by a preponderance of the evidence that the defendant intentionally discriminated against the plaintiff because of his protected status. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001). Plaintiff may use either of two methods to rebut by substantial evidence each of the nondiscriminatory reasons articulated by the employer: pretext or mixed motive. *Rachid v. Jack in The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004); *Reeves*, 530 U.S. at 143. "Evidence is 'substantial' if it is 'of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might

reach different conclusions." *Laxton v. Gap, Inc.*, 333 F.3d 572, 579 (5th Cir. 2004).

For pretext, the plaintiff must show that the defendant's proffered explanation is false or "unworthy of credence." *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2004), *citing Wallace*, 271 F.3d at 221. One way is to show that the employer treated plaintiff more harshly that other "similar situated employees" for "nearly identical conduct", i.e, a disparate treatment theory using comparators. *Wallace*, 271 F.3d at 221; *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009). Although the presumption of discrimination has disappeared, the trier of fact may consider evidence establishing the plaintiff's *prima facie* case and inferences drawn therefrom in determining whether the employer's explanation is pretextual. *Reeves*, 530 U.S. at 143. Coupled with the Plaintiff's *prima facie* case, for purposes of summary judgment the evidence of pretext usually will constitute sufficient evidence to raise an issue of material fact as to whether the employer's reason is credible or merely a pretext for discrimination or, if its reason is true, that a discriminatory reason more likely motivated the decision to effect its adverse employment action. *Reeves*, 530 U.S. at 143, 147-49.[2] Sometimes, however, additional evidence may be required. *Id.* "[T]he factfinder's rejection of

---

[2] In *Reeves*, the Supreme Court found that the Fifth Circuit panel "erred in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination." *Reeves*, 530 U.S. at 149.

the employer's legitimate, nondiscriminatory reason for its action does not *compel* judgment for the plaintiff.  The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct.'  In other words, '[i]t is not enough . . . to *dis*believe the employer; the fact finder must *believe* the plaintiff's explanation of intentional discrimination.'"  *Id.* at 146-47 (emphasis in original), *citing St. Mary's Honor Center*, 509 U.S. at 511, 524, 519.  "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors.  Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."  *Id.* at 148-49.

Alternatively, rather than demonstrating that the defendant's articulated reason for its action is a pretext for discrimination, the plaintiff may show that the defendant's reason for the decision, while true, is only one reason for its conduct and another motivating factor is plaintiff's protected characteristic.[3]  *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004); *Pinkerton v. U.S. Dept. of Educ.*, 508 F.3d 207, 213 (5th Cir. 2007).

---

[3] The Fifth Circuit calls this the "modified *McDonnell Douglas*" approach.  *Rachid*, 376 F.3d at 312.

To assert a claim of retaliation under Title VII, a plaintiff with only circumstantial evidence must satisfy the burden-shifting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  First the plaintiff must make a *prima facie* case of retaliation that meets three elements:  (1) the employee engaged in an activity that is protected by Title VII; (2) the employer took an adverse employment action against the employee; and (3) there is a causal connection between the protected activity and the adverse employment action.  *Brazoria County, Tex. v. EEOC*, 391 F.3d 685, 692 (5th Cir. 2004), *cited for that proposition in Cooper v. Dallas Police Assoc.*, 278 Fed. Appx. 318, 320 (5th Cir. 2008), *cert. denied*, 129 S. Ct. 1912 (2009).  *See also McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).

The statute defines "protected activity" as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding or hearing under Title VII.  42 U.S.C. § 2000e-3(a).  "[T]o establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity."  *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 (5th Cir. 2003).  The anti-retaliation provision of Title VII does not protect an employee from all retaliation, but only from retaliation that produces an injury or harm.  *Burlington Northern*, 548 U.S. at 67.

An "adverse employment action," for the second prong in a

retaliation claim only, is not limited to the Fifth Circuit's previous "ultimate employment decision" standard for discrimination claims under the statute.  The Supreme Court has held that "the standard for retaliation is broader than for discrimination" in that such actions are not limited to tangible employment actions. For purposes of a retaliation claim, an adverse employment action is one that "a reasonable employee would have found . . . [to be] materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 68 (2006).[4]  *See also McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007)(same)(*quoting Burlington N.*, 548 U.S. at 68).  "The purpose of this objective standard is 'to separate significant from trivial harms' and 'filter out complaints attacking the ordinary tribulations of the workplace, such as sporadic use of abusive

---

[4] As the Fifth Circuit explained in *Bouvier*, 2009 WL 3444765, at *3 n.2,

> The Supreme Court has held that Title VII's anti-retaliation provisions prohibit more conduct than its anti-discrimination provisions.  *See Burlington Northern*[, 548 U.S. 53].  Expressly limiting its holding to retaliation claims, the Supreme Court abrogated the "ultimate employment [decision] test" and held that employees must show that a reasonable employee would have found the challenged action materially adverse.  *Id.* at 67.  However, in the Fifth Circuit the "ultimate employment test" still applies to cases alleging discrimination.  *See McCoy [v. City of Shreveport*, 492 F.3d 551, 559-60 (5th Cir. 2007)] ("In *Burlington Northern*, the Court expressly limited its holding to Title VII *retaliation* claims . . . ."(emphasis in the original).

language, gender-related jokes, and occasional teasing." *Stewart v. Mississippi Transp. Com'n*, 586 F.3d 321, 331 (5th Cir. 2009), *citing Burlington N*, 548 U.S. at 68.

Unlike the mixed motive causation analysis permissible for other Title VII claims, "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. v. Texas Southwest Med. Center v. Nassar*, __ U.S. ____, 133 S. Ct. 2517, 1533 (2013). *In accord, Finnie v. Lee County, Miss.*, 541 Fed. Appx. 368, 371-72 (5th Cir. Sept. 12, 2013).

The Fifth Circuit has held that temporal proximity between the protected activity and the alleged adverse employment action, by itself, is insufficient to create a genuine issue of material fact for the element of causation. *DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 Fed. Appx. 437, 443 (5th Cir. 2007)(collecting cases on temporal proximity). *See also Mayberry v. Vought Aircraft Co.,* 55 F.3d at 1092 (Close timing may be a significant factor, but not necessarily determinative of the relation between the protected activity and the adverse action.); *McCoy*, 492 F.3d 562 (although temporal proximity between the protected activity and an adverse employment action may be enough of a "causal connection" to establish a *prima facie* case, "once an employer offers a legitimate, nondiscriminatory reason that explains both the adverse

action and the timing, the plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive.").

"'Petty slights, minor annoyances, and simple lack of good manners'" are not actionable retaliatory conduct that would dissuade a reasonable employee from making a charge of discrimination. *Stewart*, 586 F.3d at 332*, citing Burlington Northern*, 548 U.S. at 68. "'The significance of any particular act of retaliation will often depend upon the particular circumstances. Context matters.'" *Id.*, *citing Burlington N.*, 548 U.S. at 69. If the context shows no adverse impact as a result and no blame can be attributed to the employee that "might carry a stigma in the workplace," an employment action is not an adverse action. *Id.* "'[A] lateral reassignment to a position with equal pay could amount to a materially adverse action in some circumstances,'" which should be judged from the viewpoint of a reasonable person in the plaintiff's position, considering all the circumstances: did the reassignment affect the employee's job title, grade, duties hours, salary, or benefits or cause a diminution or increase in prestige or standing among her co-workers? *Id., citing Aryain* v. Wal-Mart Stores Tex, LP, 534 F.3d 473, 485 (5th Cir. 2008).

If the plaintiff succeeds in making a *prima facie* case of retaliation, a presumption of discrimination arises, and the burden shifts to the defendant employer, to provide a legitimate, nonretaliatory reason for the adverse employment action. *Hockman v. Westward Communications LLC*, 407 F.3d 317, 330 (5th Cir. 2004),

*cited for that proposition in Cooper*, 278 Fed. Appx. at 320.  If the employer succeeds, under the *McDonnell Douglas* framework the presumption of discrimination falls away and the plaintiff must show that the employer's articulated reason for its action is merely a pretext for retaliation.  *Cooper*, 278 Fed. Appx. at 320, *citing McDonnell Douglas*, 411 U.S. at 804.  The plaintiff must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer.  *McCoy*, 492 F.3d at 557.  The plaintiff can show pretext "by showing that the employer's proffered  explanation is false or 'unworthy of credence.'"  *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003), *quoting Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. at 143.  For example, Plaintiff could show that she is clearly better qualified than the person who got the job, promotion, raise, etc.,[5] or that the employer's articulated reason is false by showing inconsistency in the employer's explanations at different times.  *Burrell*, 482 F.3d at 412, *citing Celestine v. Petroleos de Venezuela SA*, 266 F.3d 343, 356-57 (5th Cir. 2001), and *Gee v. Principi*, 289 F.3d 342, 347-48 (5th Cir. 2002)("a factfinder may infer the ultimate fact of retaliation by

---

[5] "However, the bar is set high for this kind of evidence because differences in qualification are generally not probative evidence of discrimination unless those disparities are 'of such a weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" *Celestine*, 266 F.3d at 357, *quoting Deines v. Texas Dept. of Protective and Regulatory Servs.*, 164 F.3d 277, 280-81 (5th Cir. 1999).

the falsity of the explanation"). "[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," and thereby preclude summary judgment. *Reeves*, 530 U.S. at 135.

To prevail on a hostile work environment claim, Rodriguez must prove that her "workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993), *quoting Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-67 (1986). The elements of a sexually and/or racially hostile work environment claim are (1) the plaintiff belongs to a protected group, (2) she was subjected to unwelcome sexual or racial harassment, (3) the harassment was based on the plaintiff's gender or race, (4) the harassment affected a term, condition, or privilege of employment, and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Roberts v. Unitrin Specialty Lines, Ins. Co.*, 405 Fed. Appx. 874, 880 (5th Cir. 2010), *citing Mota v. Univ. of Tex. Hou. Health Sci,. Ctr.*, 261 F.3d 512, 523 (5th Cir. 2001); *Williams-Boldware v. Denton County, Texas*, 741 F.3d 635, 640 (5th Cir. 2014), *citing Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012). The court must look at "all the circumstances," including the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.  To be actionable, the hostile environment must be both objectively and subjectively offensive.  *Id.* at 21-22. "[S]imple teasing, offhand comments, and isolated incidents" do not constitute actionable harassment "unless extremely serious." *Faragher*, 524 U.S. at 788.  If the employer takes "prompt remedial action," he may avoid liability for such harassment.  *Williams Boldware*, 741 F.3d at 640, *citing Hockman v. Westward Communic'ns, LLC*, 407 F.3d 317, 329 (5th Cir. 2004).  Nevertheless the employer may be liable if the plaintiff can demonstrate that the employer's response was not reasonably calculated to stop the harassment. *Id., citing id.*

Employment discrimination claims under 42 U.S.C. § 1981, which protects against race-based discrimination,[6] "are analyzed under the evidentiary framework applicable to claims arising under Title VII of the Civil Right Act f 1954." *Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309, 311 (5th Cir. 1999)(per curiam).

---

[6] *Runyon v. McCrary*, 427 U.S. 160, 167 (1976)(§ 1981 protects against race-based discrimination); *Foley v. Univ. of Houston System*, 355 F.3d 333, 339 (5th Cir. 2003)(§ 1981 protects against retaliation for opposition to race discrimination in the workplace).

**Cameron's Motion for Summary Judgment (#17)**

Supported by competent summary judgment evidence, Cameron moves for summary judgment on all Rodriguez's claims.

In March 2008 Plaintiff, an African American female, began working as a temporary employee for Cameron to replace a worker out on medical leave.  When the worker returned, Cameron hired Plaintiff full time from August 4, 2008-June 22, 2009 as a Human Resources Assistant for the Valves and Measurement Group, where she assisted in the onboarding process, including recruiting, screening, new hires, and new hire orientation.  That position was eliminated when a hiring freeze was imposed at Cameron.[7]  On June 22, 2009 Cameron offered her a receptionist position, which she considered to be a demotion, but she was grateful just to have a job and even though the pay grade for that position was lower, her pay remained the same as for the Human Resources position, although she was not permitted to participate in bonuses and raises. Plaintiff's Dep., p. 48:1-52:l.6; 56:14-25; 61:18-62:17.  She did apply for a data entry position, but that was given to the African American woman whom she initially replaced, Larice Guidry.  *Id.* at 52:10-53:19.[8]

Plaintiff's duties as a receptionist were to answer the switchboard and connect the caller with the appropriate person, and to greet and be friendly, welcoming, courteous, and respectful to visitors.  *Id.*, 54:13-58:13.  She worked from 8:00 a.m.-5:00 p.m.

---

[7] Decl. of Fabio Tosca, p. 1.

[8] See also Decl of Tosca, p. 2.

Although Rodriguez was told a number of times to park in the back
garage and leave the front garage for visitors, she often parked in
visitor parking if she was running late and there was a line to get
into the employee garage, "maybe a couple of times a week." *Id.*,
64:23-65:22; 131:6-11.[9]  Although she was supposed to be on time,
the deposition testimony shows she was frequently late, and she was
absent so often that Cameron had to dock her vacation time when she
ran out of sick days.  *Id.*, at 66:5-75:24.  Plaintiff testified
that she was "okay with this," that it did not upset or offend her,
and that she continued to have a good relationship with her direct
supervisor, Michelle Poe ("Poe").     *Id.*, 6-17.  During her
deposition Rodriguez initially claimed that some of her late
arrivals were caused by getting her children ready and to school,
but she then conceded that they took the bus, which picked them up
at 6:40 a.m., and that she had plenty of time afterward to get to
work on time.  *Id.*, 70:12-72:13.  Poe printed out many of the
emails Plaintiff sent telling Poe that Plaintiff would be late, had
Plaintiff sign them on August 24, 2009, and placed them in
Plaintiff's personnel file.[10]    *Id.* at 72:14-73:6.  Plaintiff
testified that she did not find that action odd and that her
frequent tardiness could have been frustrating for Poe.     *Id.*,
72:19-74:2.  In 2009 after Rodriguez had used up all of her leave
by mid-year, Poe admonished Plaintiff that if she missed any more
time for whatever reason, it would be treated as unpaid leave.  *Id.*

---

[9] See also Decl. of Tosca, p. 2.

[10] See Exhibits 8-12.

76:3-14.  Moreover, Plaintiff conceded that she was "having an
ongoing discussion with [Poe] about . . . not being there from 8:00
to 5:00for an eight-hour day and that Plaintiff was required to
sign documents reflecting her tardiness to the point where
Plaintiff asked if there was going to be a written warning.  *Id.*,
76:21-80:20.  Plaintiff was also responsible for sorting the
afternoon mail when another employee, Elaine Brod, was out, but Poe
again was frustrated with Plaintiff for failing to do so.  *Id.*,
81:8-84:9.

Plaintiff was supposed to record her time at work by logging
it into a computer, but Poe had to order her to go back and correct
her entries, which reflected eight-hour days despite the fact that
she arrived late and left early on a number of occasions, and to
change a lot of entries to unpaid leave because of her excessive
absences.  *Id.*, 87:8-89:15.[11]

In May 2010, Poe was replaced by Fabio Tosca ("Tosca") as
Plaintiff's direct supervisor.  Tosca's Decl. at ¶11.  Plaintiff's
relationship with Tosca quickly deteriorated, a "steady decline."
Id.,  101:2-7.  He criticized her paging performance for
interrupting office work, not saying please and thank you, talking
too loud into the speaker, using too many words, interrupting
people, and mispronouncing visitors' names.  *Id.* at 101-103.
Plaintiff was the only employee under Tosca's supervision.  She
conclusorily claimed, "I personally don't think he liked me because
of the color of my skin and I'm female."  *Id.*, 104:4-5.  She

---

[11] See also Tosca Decl. at p. 2.

further complained that he would "speak down to me, scream at me in front of people, in front of visitors." *Id.*, at 105:1-2.

In his Declaration at pp. 2-3, Tosca stated,

11. I became Ms. Rodriguez's direct supervisor on May of 2010.   I noticed that Ms. Rodriguez continued to have performance and attitude problems.  Ms. Rodriguez was not good at conveying a professional image.  Ms. Rodriguez had a poor demeanor and disposition and this came across to those who interacted with her.  As time passed, I would tell Ms. Rodriguez about areas in which she needed to improve including her attitude, how she presented herself, being courteous, and wearing proper professional attire.   Ms. Rodriguez would get angrier each time I counseled her about these performance problems.

12.   In August 2010, there were at least two formal complaints made about Ms. Rodriguez within a two week period about her customer service skills as a receptionist. Two Cameron employees, Stacey Chovanec and Susan Sauvage, complained at separate times that Ms. Rodriguez was "hostile and unfriendly." Ms. Rodriguez testified that she did not have a bad relationship with either of them.  Ms. Rodriguez admitted that she could come across as "stern."

13.   On another particular occasion, a visitor came to see a Cameron employee after Ms. Rodriguez had been the receptionist for over a year.   It was Ms. Rodriguez's responsibility as receptionist to locate that person. Ms. Rodriguez was expected to call the desk of the person being visited, and if that person was not available, Ms. Rodriguez would page them over the intercom.   Ms. Rodriguez did not make any effort beyond that to locate the Cameron employee being visited.   Another Cameron employee, Rebecca Daingerfeld was forced to send Ms. Rodriguez an email demonstrating how to use the online phone book to locate contact information for Cameron employees.  This was something basic that Ms. Rodriguez should have been able to do especially after having been on the job for as long as she had.

14.   On another occasion, a representative from Cameron's benefits center, Charlotte Strachan, was scheduled to go to the Briarpark facility and explain certain benefits to Cameron employees.   Strachan was unable to find the facility and was late for the meeting as a result.   Ms.

Rodriguez was not willing to page, instant message, or
call anyone on their mobile to assist proactively.  Ms.
Rodriguez also informed Cameron's local point of contact,
Rebecca Dangerfield,[12] that she was unaware of the
meeting, in which conference room the meeting was being
held, and that she had no way to find out.  Another
Cameron employee, Stacy Chovanec, went to the visitor
parking lot to wait for Ms. Strachan, however all of the
visitor parking spots were occupied.  While Ms. Chovanec
was waiting, Ms. Rodriguez went down to her car, which
was in the visitor parking lot.

Plaintiff stated that she never complained about race
discrimination or race harassment to Adam Nightingale, Tosca's
supervisor, and while she mentioned to Tosca that some
inappropriate comments were made, she never specified "who or
where" because, she claimed, she did not want retaliation  *Id.*,
135:7-136:17.  She conceded that since she did not give names or
describe what happened, there was nothing Tosca could do about it,
and that she did not provide him with the information that was
necessary for him to investigate.  *Id.*, 137:18-23; 138:1-8.
Plaintiff testified that she was retaliated against not because of
these complaints to Tosca, but because she complained to
Nightingale about Tosca, about how he treated her, that part of the
reason was because "he's either a racist or he doesn't like me
because I'm a woman."  *Id.*, 138:12-14:8.  But when asked if it
could not be that he just did not like her, she admitted, "It could
be."  *Id.*, 140:9-11.

Several employees complained to Nightingale that Rodriguez was
texting on her cell phone without greeting visitors who came into

---

[12] The Declaration spells this woman's name in two different
ways.

the reception area.  Tosca Decl. at ¶18 and Ex. 9 thereto; Pl's.
Dep., 160:17-162:7 and Ex. 17 thereto.

After enough complaints were made to Nightingale and Tosca
about Plaintiff, she was placed on a performance improvement plan
("PIP"), was counseled on all the problems mentioned above, was
given thirty days to improve her performance or be terminated, and
was asked to sign the document delineating her unacceptable level
of service, professionalism and attitude.  *Id.*, p. 134:1-24 and Ex.
17 thereto; Nightingale Decl. at ¶5; Tosca Decl. at ¶15 and Ex. 9
thereto.  Nightingale also counseled her on her inappropriate use
of her work email to other Cameron employees advertising her
private "at home" business" for Advocare, which violated Cameron's
policies.  Tosca Decl. at ¶20 and Exs. 7 and 9; Pl.'s Dep. 119:16-
122:3 and Ex. 15 thereto.

After this meeting Plaintiff was required to have weekly
meetings with Tosca to review her performance, and he became a much
more "hands on" supervisor.  Pl.'s Dep. at 190:9-18; Tosca Decl. at
¶22.  Plaintiff testified that she became very frustrated with
Tosca, that he was driving her crazy by correcting her performance
issues several times a day, and that she wished he was no longer
her supervisor.  Pl.'s Dep. at 187:2-188:12.  In November or early
December 2010 Rodriguez complained about Tosca to co-worker Elaine
Brod.  Decl. of Brod. at ¶6.  Plaintiff, who was very upset, told
Brod that she had "just about had it with him and was going to do
something about it." *Id.*  Concerned about what Rodriguez might do,
Brod told her supervisor, Larry Vyvial, the Engineering Director,
who told Brod to wait and see if Rodriguez calmed down.  Brod Decl.

at ¶ 6; Pl.'s Dep., at 203:11-19; 205:1-13.  On December 9, 2010, in tears, Rodriguez, in front of Brod, threatened to slash Tosca's tires and hurt him physically and stated that she did not care if she went to jail because of doing so.  Brod Decl. at ¶7; Pl.'s Dep., 207:18-208:25 and Ex. 21 thereto.  Brod reported the threats to Vyvial.  Brod Decl. at ¶7; Pl.'s Dep. at 203:20-24.  Vyvial and Brod then informed Tosca of the threats and their concern.  Brod Decl. ¶7; Tosca Decl. ¶¶ 23-24.  After investigating the allegations and interviewing Brod and others and confirming the threats, Nightingale confronted Plaintiff and asked her why someone would make up such threats.  Nightingale Decl at ¶7; Tosca Decl. ¶25 and Ex. 12; Pl.'s Dep. at 211:4-212:7 and Ex. 21.  She responded that she did not know, but that a lot of people at Cameron hate her.  Nightingale Decl. at ¶8; Tosca Decl. at ¶26 and Ex. 12; Pl.'s Dep. at 215:3-10 and Ex. 21.  Plaintiff admitted that she and Tosca were frustrated with each other.  She further agreed that Nightingale would have been "crazy" not to address her threats to Tosca.  Pl.'s Dep., at 200:10-17.  Rodriguez was terminated by Nightingale, who escorted her to her car, which once again was parked in the visitor garage.  Nightingale Decl. at ¶8; Tosca Decl. at ¶26 and Ex. 12; Pl.'s Dep. at 215:16-19 And Ex. 21; 216:1-7.  She was replaced by African American female Kianna Granville.  Plaintiff conceded that this replacement showed that Cameron was not prejudiced against black women.  Pl.'s Dep. at 119:11-15.

Cameron moves for summary judgment on all Rodriguez's claims.  On the claim for wrongful termination in violation of Title VII and 42 U.S.C. § 1981, Cameron first contends that Plaintiff has not and

cannot establish a *prima facie* case of race or sex discrimination because she was replaced in her receptionist position by an African American woman, Kianna Granville, the fourth element of such a claim.  Plaintiff's Dep. at 114:13-18; 119:11-15.  Alternatively, nor has she provided any evidence of any similarly situated employees not in the protected class who were treated more favorably than she was.  Plaintiff testified that she was fired because people perceived her to be an "angry black woman."  *Id.*, 118:2-3.  When Plaintiff was hired as a receptionist, she  replaced Larice Guidry, whom Plaintiff described as an "angry" black woman.  *Id.*, 118:4-20.  In fact, Guidry was promoted from receptionist to a Human Resources position.  *Id.*, 118:2-119:2.  And Guidry was ultimately promoted to the position that Plaintiff wanted.  *Id.*, 119:4-7.  When she was finally terminated, Plaintiff was again replaced by an African American, Kianna Granville, who was also promoted out of the receptionist position.  Nightingale Decl. at ¶9.

Cameron also claims that Plaintiff cannot establish a *prima facie* case of retaliation.  First Plaintiff did not engage in protected activity as defined by the statute (making a charge, testifying, assisting, or participating in any investigation, proceeding or hearing under Title VII).  42 U.S.C. § 2000e-3(a).  Here Rodriguez testified that she complained to Nightingale that Tosca was too hard on her.  Pl.'s Dep., 139:12-22.  Her main objection was that Tosca spoke to her as if "she was stupid," but that it could have been because he did not like her, not because of her race or gender.  *Id.*, 112:1-11.

Furthermore, Plaintiff cannot establish a causal link between any alleged protected activity and her discharge for her retaliation claim.  To establish a causal link, one must consider all relevant factors, such as "(1) the employee's past disciplinary record, (2) whether the employer followed its typical policy and procedures in terminating the employee, and (3) the temporal proximity between the employee's conduct and termination." *Smith v. Xerox Corp.*, 371 Fed. App. 514, 520 (5th Cir. 2010).  If the employer did not know of the employee's protected conduct when it terminated her, the employer could not have retaliated against her based on her conduct.  *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir. 1999).  Here, as demonstrated by Cameron's documentary evidence, Plaintiff's past disciplinary history was poor.  She continually had poor performance and a poor attitude during her employment as a receptionist, which resulted in her being placed on a PIP in August 2010.  Decl. of Tosca at ¶¶ 8-22; Decl. of Nightingale, ¶5 and Ex. 9 thereto; Plaintiff's Dep., 134:5-24 and Ex. 17 thereto.  Plaintiff has not alleged that Cameron failed to follow its regular policy and procedures in either supervising or terminating her.  The undisputed record demonstrates that Nightingale, who made the termination decision, never knew or believed that Plaintiff had complained about discrimination of any kind.  Nightingale Decl. at ¶10; Tosca Decl. at ¶ 28.  "[T]o establish the causation prong of a retaliation claim, an employer should demonstrate that the employer knew about the employee's protected activity." *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 (5th Cir. 2003).

Cameron further points out that even if Plaintiff had established a *prima facie* case of retaliation or race/sex discrimination, Cameron has articulated a legitimate, nondiscriminatory reason for discharging Rodriguez, i.e., that she threatened to slash Tosca's tires and cause him physical harm, indeed kill him. Nightingale Decl. at ¶¶ 6-8. Moreover, Rodriguez merely argues that she never made the threats. Cameron insists that this is insufficient as a matter of law and that she must prove that discrimination or retaliation actually motivated the discharge. It is well established in the Fifth Circuit that a reviewing court "is not to engage in second-guessing of an employer's business decisions." *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 282, 291 (5th Cir. 2007). The "anti-discrimination laws do not require an employer to make proper decisions, only non-retaliatory ones." *Id.*, *citing Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)(stating that "even an incorrect belief that an employee's performance is inadequate" is a legitimate reason."). Thus Rodriguez must do more than argue that Cameron reached an unjust or incorrect conclusion; she must show that Cameron's articulated reason was a pretext, a lie. Instead, Plaintiff testified that Nightingale honestly believed the allegations against her, admitting that she and Tosca were frustrated with each other, and frankly stating that Nightingale would have been "crazy" not to address the threat to Tosca. Pl.'s Dep., 200:10-17; 198:11-202:12.

Moreover, Cameron asserts that Rodriguez's claims of a racially and sexually hostile work environment fail because she

cannot establish two elements:  (1) the harassment she allegedly suffered was based on her race or her sex, i.e., whether members of one sex or race are exposed to disadvantageous terms or conditions of employment to which member of the other sex or another race are not exposed; and (2) the alleged harassment affected a term, condition or privilege of her employment.  When questioned about Tosca's treatment of her, Plaintiff admitted it could have been because he did not like her, not because of the color of her skin or because she is a woman.  Pl.'s Dep., 110:10-112:11; 108:8-18. Moreover, when asked what "harassing" means, she answered, "Being overboard with the reprimand."  Pl.'s Dep., 222:7-9.  She claimed Tosca humiliated and degraded her when he would scream at her in the lobby in front of people, for instance about her performance in paging.  Pl.'s Dep., 220:7-222:9.  Such did not affect a term, condition or privilege of her employment.  "Title VII is not a shield against harsh treatment at the work place; it protects only in instances of harshness disparately distributed."  *Jackson v. City of Killeen*, 654 F.2d 1181, 1186 (5th Cir. 1981).  Rodriguez failed to show that Cameron is "permeated with 'discriminatory intimidation, ridicule and insult,' that is 'sufficiently severe or pervasive to alter the conditions' of her employment and 'create an abusive working environment.'"  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002).  Instead her "harassment" was non-severe and non-pervasive.  In sum, Cameron claims, it is also entitled to summary judgment on the hostile work environment claim.

The Court finds that Cameron has more than met its burden to show there are no genuine issues of material fact regarding any of

Rodriguez's claims, while Rodriguez has failed to submit any evidence that might raise an issue for trial.  Accordingly, the Court



ORDERS that Cameron's motion for summary judgment is GRANTED.
Final judgment will issue by separate order.

**SIGNED** at Houston, Texas, this __3rd__ day of __July__, 2014.


_____

MELINDA HARMON
UNITED STATES DISTRICT JUDGE